15081

COPELAND *ET AL.* v. CRAIG *ET AL.*

(8 S. E. (2d), 858)

486

October, 1938.

*Messrs. Donald Russell* and *David J. Craig, Jr.,* for appellants,

*Messrs. Osborne, Butler & Moore,* for respondent, Catherine C. Bunting,

May 8, 1940.

The opinion of the Court was delivered by MR. WM. H. GRIMBALL, ACTING ASSOCIATE JUSTICE.

This action was commenced on March 12, 1937, by the executors of the last will and testament of J. W. Copeland against the beneficiaries of his will for a settlement of the estate and an adjudication that ninety shares of Statesville Cotton Mills Stock transferred by testator on the books of the corporation into the name of Catherine Bunting remained the property of the estate. The issue upon this appeal is whether the estate of J. W. Copeland or Catherine Bunting, a daughter of testator and one of the beneficiaries of his will, is the real owner of that stock. The executors in their complaint claimed that the stock was issued in the name of Mrs. Catherine Bunting for convenience only and that the title thereto was held by the said J. W. Copeland, Sr., but that Mrs. Bunting asserted claim thereto in her own right and demanded delivery of the same to her, and that the other legatees contended that it belonged to the estate and claimed their interest therein under the terms of the will. Mrs. Bunting in her answer claimed the stock as a gift to her and set up that under the law of North Carolina, which created the corporation, the stock belonged to her. The other defendants, legatees, in their answer denied the validity of the gift and set up that if it were held a valid gift it constitutes an advancement to Mrs. Bunting for which she should account to the estate.

The case was referred by consent to R. E. Babb, Esquire, as Special Referee, who upon evidence introduced, including statutes and decisions as to the law of North Carolina, filed a carefully considered report of thirty-seven printed pages going fully into all questions of law and fact, wherein he upheld the transfer of the stock to Mrs. Bunting as a valid gift, ruling against the contention that the same should be accounted for by her as an advancement. Upon exceptions to the report by all parties other than Mrs. Bunting, the case was heard by Honorable G. B. Greene, presiding Judge, who entered a decree affirming the report in all respects and adjudged the ninety shares of stock to be the absolute property of Mrs. Catherine Bunting. The de-

cree recites that no exception was taken to the report and no contention made by the executors or the other defendants upon the point as to whether Mrs. Bunting should be charged with an advancement. No exception having been taken to the decree in that respect, the question as to advancement or ademption has passed out of the case. The executors have not appealed from the decree. The appeal is by four of the beneficiaries under the will.

The facts as found by the Referee and concurred in by trial Judge, which we abbreviate and condense to the essentials, are as follows:

J. W. Copeland, late of Clinton, in the County of Laurens, died at an advanced age on February 14, 1936, leaving of force his last will and testament, which bears date December 20, 1930. This will was duly admitted to probate in common form in the Probate Court for Laurens County on March 9, 1936. The will gives to the testator's widow, Bessie Sitgreaves Copeland, for life or widowhood, the home in Clinton, with the provision that upon her death or remarriage, the same is to "revert to my heirs." He also gives to his widow during her life or widowhood income from 100 shares of common stock in the Statesville Cotton Mills, of Statesville, North Carolina, and certain other stocks and bonds. The residuary clause provides that the remainder of his property shall be divided into six shares, one each of which goes to the testator's daughters, V. Copeland Craig, Catherine Bunting and Corre C. Steel, and his granddaughters, Beth Sloop (now Sronce), and Frank Wallace Webster (now Ivey). The sixth share is stated by the testator to represent the natural inheritance in his son, J. W. Copeland, Jr., but that because testator had already advanced his son large amounts of money, very considerably in excess of the share he might be entitled to in the testator's estate, his share is directed to be divided among the other residuary devisees and legatees.

Prior to September 17, 1934, J. W. Copeland was the owner of 200 shares of the common stock of Statesville

Cotton Mills, represented by the following certificates, for the number of shares indicated:

Certificate 1011 . . . . . . . . . . . . . . . 100 shares.
Certificate 1012 . . . . . . . . . . . . . . . . 20 shares.
Certificate 1013 . . . . . . . . . . . . . . . . 60 shares.
Certificate 1017 . . . . . . . . . . . . . . . . . 3 shares.
Certificate  993 . . . . . . . . . . . . . . . . 17 shares.

He also held certificate No. 815 for 50 shares issued in the name of David J. Craig and endorsed by David J. Craig in blank.

On September 17, 1934, Mr. Copeland appeared in person at the office of Statesville Cotton Mills, with Certificate No. 1011 for 100 shares, which he had either already endorsed in blank by signing his name thereon, or which he signed in the presence of Mr. Bunch, its secretary and treasurer. Without assigning any reason therefor he requested Mr. Bunch to cancel the old certificate and issue two new certificates in lieu thereof, one for 90 shares in the name of Mrs. Catherine Bunting, 1759 Central Avenue, Memphis, Tennessee, and the other for 10 shares in his, J. W. Copeland's, name. This Mr. Bunch did, taking the old certificate for 100 shares, marking it cancelled and attaching it to the appropriate stub in the stock book, and preparing two new certificates in accordance with Mr. Copeland's request, which he delivered to Mr. Copeland at the time at the mill office, and which Mr. Copeland put in his pocket and departed. Appropriate entries were made by Mr. Bunch on the records of Statesville Mill to show the transfer so made, and necessary revenue stamps were affixed.

Upon the death of Mr. J. W. Copeland, according to the testimony of his brother, M. L. Copeland, one of the executors, the stock certificate No. 1084, which had been issued by Mr. Bunch in the name of Mrs. Catherine Bunting on September 17, 1934, was found in Mr. J. W. Copeland's safe in the basement of his home at Clinton, along with other stock certificates and papers, but Mr. M. L. Copeland

was unable to say whether this certificate was separately folded or differently arranged from the others. No further change had been made in Mr. Copeland's stock in the Statesville Mill after September 17, 1934, and be still held the certificates listed above, except for the change made by the surrender of the 100-share certificate and the issue therefor of the 90-share certificate to Mrs. Bunting and the 10-share certificate to Mr. Copeland.

From September 17, 1934, the date of the transfer of the stock on the books of the mill, under February 14, 1936, the date of Mr. Copeland's death, the mill paid the following dividends on the 90 shares of stock in Mrs. Bunting's name:

| | | |
|---|---|---|
| October 1, 1934 | $135.00 |
| January 1, 1935 | 315.00 |
| July 1, 1935 | 315.00 |
| January 1, 1936 | 315.00 |

These dividends were represented by checks drawn on the mill's account in a Statesville bank. All were made payable to and mailed to Mrs. Bunting at the address in Memphis given the mill by Mr. Copeland. The first check for $135.00 was endorsed by Mrs. Bunting, and bears the endorsement of several banks through which the same passed, bearing no other endorsement except Mrs. Bunting's, save the bank endorsements. The three remaining checks of $315.00 each were endorsed by Mrs. Bunting to the order of J. W. Copeland, and by him endorsed in blank, such checks carrying the endorsements of banks through which they cleared. All dividends on the remaining 110 shares which stood in the name of Mr. J. W. Copeland were paid to him by checks of the mill and collected by him. Subsequent to September 17, 1934, all notices of stockholders' meetings and all other notices sent out by the mill in connection with the 90 shares were mailed to Mrs. Bunting at her Memphis address.

From September 17, 1934, the records of the mill show no interest of any one in the 90 shares except Mrs. Bunt-

ing, and, so far as the records of the mill show, and to the extent that Mr. Bunch's knowledge goes, no one has ever exercised or attempted to exercise any right in or control over or claim to the 90 shares of stock except Mrs. Bunting. Mr. Bunch testified that he would not have transferred the 90 shares without the surrender of the certificate properly endorsed by Mr. Copeland. He also testified that the transfer made on September 17, 1934, was made in exactly the same manner as all other stock transfers had been made during the 19 years Mr. Bunch had been with the mill. These facts are uncontradicted and were admitted without objection.

Plaintiffs offered in evidence two letters from testator to his daughter, Mrs. Catherine Bunting, dated October 5 and November 2, 1935, as bearing upon testator's intention in transferring this stock to Mrs. Bunting. Attorneys for Mrs. Bunting objected. The Referee at first admitted these letters but later excluded them, under the cases of *Bennett v. Cook,* 28 S. C., 353, 6 S. E., 28, and *Ott v. Ott,* 182 S. C., 135, 136, 188 S. E., 789, as being subsequent declarations made after a completed gift. For the same reason and for the additional reason that Section 692 of the Code disallows such testimony, the Referee excluded testimony of the plaintiff, Mrs. Bessie Sitgreaves Copeland, widow and executrix, to the effect that testator had told her he had transferred this stock to Mrs. Bunting to avoid paying taxes and had said, "It will still be my stock." The Referee also found in his report that even if the letters were admitted in evidence, the contention of plaintiffs could not be sustained.

The North Carolina law introduced in evidence will be later discussed in this opinion.

Appellants' fourteen exceptions are reduced in their brief to three propositions:

1. That the transfer of the stock upon the books of the corporation was not a sufficient delivery.

2. That testator did not intend to make a gift of the stock.

3. That it was error to exclude from evidence the subsequent letters of testator and Mrs. Copeland's testimony as to his oral statement to her.

█ The requisites and validity of a transfer of stock in a corporation are governed by the law of the state where the corporation is created. *George H. Hammond & Co. v. Hastings,* 134 U. S., 401, 10 S. Ct., 727, 33 L. Ed., 960; *Masury v. Arkansas Nat. Bank, C. C.,* 87 F., 381, and 18 C. J. S., Corporations, 940, § 399.

The present case therefore is controlled by the law of the State of North Carolina.

█ The law of another state is a question of fact to be pleaded and proven. *Bethea v. Allen,* 95 S. C., 479, 79 S. E., 639; *Frasier v. Railway,* 73 S. C., 140, 52 S. E., 964, and 1932 Code, Sec. 716.

█ The Court cannot consider statutes or decisions of another state not introduced in evidence. *Free v. Railway,* 78 S. C., 57, 58 S. E., 952, and *Columbia Weighing Machine Co. v. Rhem,* 164 S. C., 376, 162 S. E., 427.

█ Two statutes, three decisions of the State Court, and two Federal decisions were introduced in evidence as proving the law of the State of North Carolina in this case. And to the extent, of course, that there is no proof of the North Carolina law, the common law of this State will be applied. *Crosby v. Railway,* 81 S. C., 24, 61 S. E., 1064.

The North Carolina statutes in evidence, Sections 1164 and 1170 of the North Carolina Code of 1935, are as follows:

"§ 1164. *Transfer of shares.*—The shares of stock in a corporation are personal property, and are transferable on the books of the corporation in the manner and under the regulations provided by the by-laws. Whenever a transfer

is made for collateral security, and not absolutely, it shall be so expressed in the entry of the transfer."

"§ 1170. Every corporation shall keep at its principal and registered office in this State the transfer books, in which the transfer of stock shall be registered, and the stock books, which shall contain the names and addresses of the stockholders, and the number of shares held by them respectively, and shall at all times during the usual hours for business be open to the examination of every stockholder. These books shall be the only evidence as to who are the stockholders entitled to examine them, and to vote at elections. In case the right to vote upon any share of stock is questioned, the stock books of the corporation shall be referred to, to ascertain who are the stockholders, and in case of a discrepancy between the books, the transfer book shall control and determine who are entitled to vote."

The decisions of the Supreme Court of North Carolina introduced in evidence are: *Havens v. Bank of Tarboro,* 132 N. C., 214, 43 S. E., 639, 95 Am. St. Rep., 627; *Cox v. Dowd,* 133 N. C., 537, 45 S. E., 846, and *Bleakley v. Candler,* 169 N. C., 16, 84 S. E., 1039, Ann. Cas., 1917-A, 425.

According to these authorities, under the law of the State of North Carolina, the provision making stock transferable only upon the books of the corporation is not exclusive, but the generality of such provision has been modified as a concession of the needs and customs of commerce so as to permit the vesting of legal title to stock in one to whom the stock certificate has been delivered and properly endorsed by the owner in blank (or directly to the assignee), notwithstanding such transfer has not been entered on the books of the corporation.

"As between the parties, the delivery of the certificate, with assignment and power indorsed, passes the entire title, legal and equitable, in the shares, notwithstanding that by the terms of the charter or by-laws of the corporation the stock is declared to be transferable only on its books; that

such provisions are intended solely for the protection of the corporation, and can be waived or asserted at its pleasure, and that no effect is given to them except for the protection of the corporation." *Havens v. Bank, supra* (132 N. C., 214, 43 S. E., 642, 95 Am. St. Rep., 627).

After mentioning the risks which the holder takes by not presenting the certificate for transfer into his name on the books, the Court in that case goes on to say that the holder of such a certificate and power possesses "the legal title and the means of transferring such title in the most effectual manner." We take it that this most effectual manner can only have reference to causing the transfer to be entered upon the corporate books, followed by the issue of a new certificate in the name of such person. Quoting with approval from Morawetz, the opinion *inter alia* says: "No better form could be devised to assure the purchaser that he can buy with safety. He is told, under the seal of the corporation, that the shareholder is entitled to so much stock, which can be transferred on the books of the corporation in person or by attorney, when the certificates are surrendered, but not otherwise. This is a notification to all persons interested to know that whoever in good faith buys the stock, and produces to the corporation the certificate, regularly assigned, with power to transfer, is entitled to have the stock transferred to him. And the notification goes further, for it assures the holder that the corporation will not transfer the stock to any one not in possession of the certificate."

In this *Havens case* one Mehegan, the cashier of the bank, fraudulently filled in his own name as owner in one of the stock certificates which had been signed by the president in blank and left with the cashier to countersign and issue to real owners of the stock. The cashier endorsed the certificate in blank and pledged it to plaintiff as security for a loan. Upon the principle of estoppel and responsibility of the bank for the acts of its cashier when it placed him in the position to do this wrong, the plaintiff recovered against

the bank. The Court held that the fact that the certificate showed on its face that it was transferable only on the books of the corporation, etc., did not charge plaintiff with notice that a fraud had been perpetrated in the original issue of the certificate, nor protect the bank against plaintiff's rights.

The case of *Cox v. Dowd, supra,* follows *Havens v. Bank, supra,* and adds nothing to it. The principle was applied in that case to a state of facts where the owner of stock indorsed the certificate in blank and sent it to her brother to use as collateral to a loan. The lender was protected notwithstanding transfer was not made on the books of the corporation.

The same observations apply to *Bleakley v. Candler, supra,* which follows *Havens v. Bank, supra,* and *Cox v. Dowd, supra.* There the pledgee of the stock holding the certificate indorsed in blank' prevailed against a subsequent attaching creditor, who sought to attach or garnish the stock at the office of the corporation on the ground that the stock had never been transferred to the pledgee on the corporate books.

Beyond showing that the statutory requirements for transfer only on the books of the corporation are not strictly and literally enforced as written in the statute against the holder of a stock certificate indorsed in blank by the registered owner, the three North Carolina decisions above examined shed very little light upon the issues in the case before us. We find nothing in those cases to the effect that a transfer on the books of the corporation, whereby the old certificate is indorsed in blank and surrendered and a new certificate issued in the name of another person as owner, is either nugatory or meaningless. The only intimation looks to the contrary, where the North Carolina Court referred to "the most effectual manner" of transfering the stock.

We can only take it that under the law of the State of North Carolina, except in the instances shown by the above cases modifying the requirement to the extent shown, transfer on the books of the corporation remains the most efficient and effectual manner of transfer and is the final and culminating step in the process of changing the title to the stock from one person into another. And as suggested in the extract from Morawetz, *supra,* the transfer of the old certificate properly indorsed by mere delivery carries the legal title for the reason that the holder is supplied with all that he needs in order to cause a transfer to be made to his name on the books of the corporation whenever he pleases.

There was nothing in the facts or the discussion in those cases bearing upon the question of the requisites for a gift of corporate stock, or as to the effect of a person being found in possession of a stock certificate registered in the name of another and not endorsed by the registered owner. Obviously decisions as to ownership in one holding certificates *endorsed in blank by the registered owner* afford no justification for concluding that one in possession of a certificate in the name of another as the registered owner *and not endorsed by the registered owner,* is vested with the same rights. We must therefore look elsewhere than to these decisions in evidence for a guiding principle of decision.

The only other evidence of North Carolina law introduced is rather indirect, being two tax decisions of the United States Circuit Court of Appeals for the Fourth Circuit. which includes the State of North Carolina. It may be doubted whether Federal Court decisions are embraced within the meaning of Section 716 of the South Carolina Code, which allows books of reports of cases adjudged in their Courts as presumptive evidence of the laws of any other sovereignty, state, territory or foreign government. Certainly the decisions of the State Court would be the higher evidence of what the law of North Carolina is. *Erie R. Co.*

v. *Tompkins,* 304 U. S., 64, 58 S. Ct., 817, 82 L. Ed., 1188, 114 A. L. R., 1487.

However, it is not necessary to decide this point because these Federal decisions were introduced in evidence in this case without objection. We shall therefore not decline to consider them for such indirect light as may be thrown upon the North Carolina law.

In *Grissom, Collector of Internal Revenue, v. Sternberger,* 4 Cir., 10 F. (2d), 764, 766, the sole question was whether shares of stock were given by H. Sternberger to his children, or remained his property until the time of his death so that Federal estate taxes could be laid upon them. Three years before his death, Sternberger delivered to his son, Sigmund, the stock certificates together with a written assignment transferring a certain portion each to Sigmund and the other children. Sigmund put the papers in his locked box and kept them there for over three years until after his father's death. The father, Sternberger, with the consent of his children continued to vote the stock, continued to act as treasurer and director of the corporation and continued to receive the dividends under an arrangement with the children that the dividends would be used to pay insurance premiums on the father's life. The revenue collector urged that there was no evidence of delivery of the stock to the children, that the certificates were not endorsed nor transferred upon the books, and that the voting of the stock by the deceased, holding the offices of treasurer and director, and the receipt of the dividends were inconsistent with a gift of the stock. The case was submitted to the jury on the question as to whether a gift had in fact been made or whether the transaction was merely colorable. Verdict was in favor of the gift and the Court affirmed it, holding that there was an intent to transfer, the children knew of the transfer and consented to the father's voting the stock, that the delivery to Sigmund was good as to his interest and equally good as to the others. "Where the property is delivered to such third person for the benefit of the donee,

with intention that present title and ownership shall pass, and appropriate language is employed to effect such intention, the gift is executed and the third person is constituted a trustee of the donee." The Court added that this would be true even if the other children had been ignorant of the gift until after the death of their father; that it is not necessary that the certificates be indorsed when delivered along with a written assignment; that the failure to enter transfer on the corporate books had no effect upon the legality of the transfer as between the parties themselves, the statutory provision being for the protection of the corporation; and finally:

"The fact that H. Sternberger received the dividends on the stock and voted it until his death, and the fact that he continued to act as a director and treasurer of the corporation, were facts which strongly tended to show that there was no real gift of the stock during his lifetime; but it was for the jury to say what inferences were to be drawn from these facts, when considered with the other testimony in the case. They did not of themselves justify the Court in holding as a matter of law that there was no gift of the stock, in the face of positive testimony to the effect that there was such gift   *   *   *.

"The receipt of the dividends during the life of the donor was not inconsistent with a present gift."

That case also is inconclusive of the question before us. In so far as it holds that the receipt of dividends is not inconsistent with a present gift, it affords some authority in favor of the gift here. It may be well here to call attention to a real difference in fact between a case where the stock remains at all times in the name of the registered owner and a case where the old certificate is surrendered and cancelled and a new certificate issued in the name of the transferee as the new registered owner. The reason for requiring strict manual delivery of the certificate in the former case would not apply with equal force to the latter. The former case imports a change from the regis-

tered owner; in the latter the new certificate remains as issued in the registered owner, unchangeable without his endorsement.

In *Schoenheit v. Lucas*, 4 Cir., 44 F. (2d), 476, 484 (second case No. 2956), there was likewise no transfer made on the books of the corporation to the intended donees. The Court considered two different states of facts.

In the *first phase* Von Ruck, the deceased taxpayer, in 1919 made deeds of trust of blocks of stock for certain relatives and delivered the deeds to the trustee. The trust agreement provided that the stock was not to be transferred of record until the accumulated surplus of the corporation had been divided and that the trustee was to collect and receive the dividends. The deceased was sole stockholder. The trustee was his brother-in-law and had been for years manager of a branch of his business. Notwithstanding the provisions of the deeds of trust, the parties acted as if there had been no change. A stock dividend of $500,000.00 was declared and delivered in its entirety to the deceased as the person who was the sole stockholder before the donations took place. Cash dividends were paid to him, which he retained until after the dividend of 1921, when he delivered them to the trustee in the form of Liberty Bonds. The Court held that there was in the record no explanation for this conduct, that both parties ignored the explicit directions in the trust deeds and that under these circumstances the Court refused to reverse the holding of the board of tax appeals that the gifts were not intended to take effect as of the date of the deeds of trust, but at such later date as he might determine, reserving to himself in the meantime dominion and control of the property.

The essentials of a gift *inter vivos* were said by the Board of Tax Appeals to be: "(1) A definite intention on the part of the donor to make an absolute gift; (2) delivery of the subject-matter of the gift; and (3) acceptance by the donee."

The Court ·said as to the law applicable: "It is not essential to a transfer by gift of legal title to stock under the law of North Carolina that there be a transfer on the books of the company, *Grissom v. Sternberger* [4 Cir.] 10 F. ·(2d), 764; and we have no doubt that the taxpayer could have effectuated a valid gift on or about August 1, 1919, of the stock in question by the deeds of trust, even though there was no transfer on the books until a later date; provided, of course, that it was the intention of the parties that the deeds should go into actual effect on the date of their execution. On the contrary, if it was the understanding and intent of the parties that the taxpayer should retain control, and exercise dominion over the stock and the dividends thereon until some future date when the deeds should be given full force and effect, the transfer would constitute only a colorable transaction to which the law would not give effect and the income from the property in the meantime would belong to the donor rather than to the donees."

Upon the *second phase,* touching stock transferred to certain donees absolutely and free from trusts, the board was reversed in part. The records of the corporation established that on November 6, 1920, these shares of stock were transferred on the books of the company to the donees. The dividends were credited to the donees on the books, then charged against them and credited to the decedent's account. The board held: "While the stock was transferred of record, as stated above, there is no evidence to show that it was delivered to the transferees nor that there was any intention on the part of the decedent to relinquish dominion at the time of the transfer. Dividends declared during the years 1920 and 1921, at his express direction, were paid to him and he made the distribution."

The Court said that the board "expressly declared in regard to the stock transfers of November 6, 1920, that while the stock was transferred of record, there was no evidence to show that it was delivered to the transferees or that there

was any intention on the part of the taxpayer to relinquish dominion at the time."

The Court affirmed the board as to the dividends declared before November 6, 1920, which was the date that the stock was transferred to the donees on the corporate books, but reversed it as to the 1921 dividends declared after that. The Court said: "But it is clear that the Board was not justified in ignoring the undisputed testimony as to the transfers on the book on November 6, 1920, and the payment of the 1921 dividend, when declared, to the stockholders of record. * * * It is a fact, as the Board pointed out in its finding and opinion, that the shares of stock transferred on November 6, 1920, were not delivered until late in 1921. But we do not think that it follows, as the Board concluded, that there was no evidence of an intention on the part of the grantor to relinquish dominion of the stock at that time. *Even if the certificates were not delivered to the new shareholders, the transfers on the books were sufficient to vest the title in the new owners if made by Von Ruck with that intention* [Italics ours.] That such was his intention is shown by the issuance to the new shareholders on February 15, 1921, of dividend checks for the dividend of that year. * * * We think that the undisputed facts in the record as to the transfer of the stock on the books of the company on November 6, 1920, and the dividends paid thereon in the sum of $13,040, require the holding that the donor not only intended to give but actually carried his intention into effect in regard to the shares described, and that the dividends for 1921 thereon should not be included in the taxpayer's income for 1921."

We have considered these cases in detail for they are something more than mere authorities. They are the evidence in the case of North Carolina law. We find in them nothing to show that the transfer on the books of the corporation was not sufficient to vest the title to the stock in Mrs. Bunting, even if the new certificate was not delivered to her.

The case of *Zollicoffer v. Zollicoffer*, 168 N. C., 326, 327, 84 S. E., 349, was not introduced in evidence. It was however discussed in the briefs on both sides. In that case a gift was upheld where the only delivery made was by placing the stock certificate in the donor's family Bible. That case is no authority against the validity of the gift in the case before us. It is not·to be perceived that if the certificate. here had been found in Mr. Copeland's Bible instead of in his safe, it would have made any material difference.

The Referee has devoted considerable space in his report to further reasons and authorities which give additional support to the conclusions he reached. It is sufficient to say that after citing authorities that the mere naked physical possession of an instrument payable to or' in the name of another is not *proma facie* evidence of ownership in the possessor, and that where stock appears on the books of a corporation as registered in the name of a person it is *prima facie* evidence of such person's ownership of such stock, the Referee went to the heart of the matter as follows:

"When the donor, therefore, so acts as to put it within the power of the donee to take possession and exercise dominion and control, he has completed delivery, whether he actually makes a manual deliverance of the thing itself or not. It is difficult to see how a doner could better accomplish this purpose of transferring the right of dominion than by a transfer of the legal title, which Mr. Copeland accomplished when he had the stock transferred on the books of the corporation. In this connection attention is again called to the fact that a stock certificate is nothing but a muniment of title; it is not the property but a mere evidence of the right to property. So it has been held that a gift of corporate stock is complete upon transfer upon the books of the corporation by the donor to the donee, notwithstanding the donor never relinquishes and the donee never obtains actual physical possession of the stock certificate. An interesting discussion of this rule is to be found in *Phillips v.*

*Plastridge,* 107 Vt., 267, 179 A., 157 [158], 99 A. L. R., 1074, to which last report is an annotation. Under a state of facts substantially similar to those here involved, the Vermont Court says, with respect to the effect transfers, upon the books of a corporation at the instance of the donor, so as to put the stock in the name of a donee, where the stock certificates were left in the possession of the corporation:

" 'Phillips [the donor] had divested himself of all right and title to the stock, and the complete ownership had passed to his daughter. It was his voluntary act, affording an inference of the existence of a donative intent. Under the circumstances, a manual delivery of the certificates was not necessary.'

"The Vermont Court referred to the leading case of *Roberts Appeal,* 85 Pa., 84, the facts of which are almost identical with those in the instant case. The Pennsylvania Court held:

" 'The gift is complete by the delivery of the thing itself, for transferring the shares to her upon the books of the company is putting her in complete possession of the thing assigned, and clothing her with the complete legal title. It stands in the place of a delivery. Such an act performs precisely the office which an actual delivery would perform if it were a chattel. It is as complete a delivery as the nature of the thing will admit of. There can be no clearer evidence of a design to part with the right of property in favor of another than an absolute transfer of the legal title to her for her own use. * * * The certificates were but secondary evidence of her ownership and only useful for purposes of transfer. They were nothing more than the official declaration by the company of what already appeared on their books. There was here no locus pœnitentiæ. He [the donor] could not have used the certificates, nor could any one have used them except Miss Foster [the donee].'

"To the same effect are the following cases: *Chicago Title & Trust Company v. Ward,* 332 Ill., 126, 163 N. E., 319; *Jean v. Jean,* 207 Cal., 115, 116, 277 P., 313; *Whitney v. Whitney Elevator & Warehouse Company,* 121 Misc., 461, 200 N. Y. S., 792; *In re Van Wormer's Estate,* 255 Mich., 399, 238 N. W., 210; *Crouse v. Judson,* 41 Misc., 338, 84 N. Y. S., 755; *Lynch v. Lynch,* 124 Cal. App., 454, 12 P. (2d), 741; *Schoenheit v. Lucas,* 4 Cir., 44 F. (2d), 476.

"I hold therefore, as a matter of law, that when Mr. Copeland had the stock transferred on the books of Statesville Cotton Mills, to Mrs. Bunting, delivery was completed. This gave her the right to dominion and control, which, it is held by our Courts, constitutes delivery.

"The facts show that Mr. Copeland voluntarily went from his home in Clinton, S. C., to Statesville, N. C., and in person procured the transfer of this stock. He did not transfer the entire 100 shares, but only 90 shares of the certificate which he had with him, having the remaining 10 shares re-issued to himself. He knew the effect of a transfer of stock upon the books of a corporation, for he had been long engaged in business, and had been a director of this very mill. He knew the effect of an endorsement in blank and the delivery of stock so endorsed as evidence by his possession of the 50 shares in the name of David J. Craig, which Mr. Copeland held. He knew that Mrs. Bunting was receiving all notices of stockholders' meetings, and all other notices sent out by the mill to the shareholders. He knew that she was receiving the checks for the dividends on these 90 shares, for he himself had stock and knew when dividends were paid. Never did he attempt to vote this 90 shares of stock, nor request of Mrs. Bunting a proxy so that he might do so; over a period of a year and a half he never exercised or attempted to exercise any dominion or control over this stock. He had parted with the legal title and he could but have known that he had parted with it. No reason is assigned why he transferred the stock,

unless it was for the purpose of giving it to Mrs. Bunting. His retention of the certificate furnsihes no evidence to offset the chain of circumstances which can lead to but one conclusion, and that is that he intended to and did give to Mrs. Bunting, on September 17, 1934, the 90 shares of Statesville stock represented by the certificate in question. I find, therefore, under the evidence that Mr. Copeland intended to give this stock to Mrs. Bunting, that he did give it to her, and that he accomplished a delivery thereof sufficient in law."

The authorities above cited by the Referee appear to the Court to state the rule supported by the better reason, no case of a gift of corporate stock from our own State reports having been cited in the briefs. The conclusions of the Referee are not inconsistent with our cases of *Bennett v. Cook*, 28 S. C., 353, 6 S. E., 28; *Larisey v. Larisey*, 93 S. C., 450, 77 S. E., 129, and *Ott v. Ott*, 182 S. C., 135, 188 S. E., 789.

The four dividends on the stock after the transfer were in each instance paid by the Statesville Cotton Mill directly to Mrs. Bunting, the registered owner of the stock on the books. Checks for the last three of these dividends, it is true, were endorsed by Mrs. Bunting to her father, Mr. Copeland, but they had in fact first been issued and delivered to her. That circumstance is inconsistent with a retention by testator of title to the stock itself and goes far towards establishing intent and delivery. It is at least evidence thereof, and both the Referee and the Circuit Judge having found in favor of Mrs. Bunting, we cannot say that their findings of fact predicated thereon were either unsupported by evidence or clearly erroneous in point of law.

What Mrs. Bunting did with the dividend checks after she received them might have had some bearing in a suit between the tax collector and the estate, upon the question whether the amounts involved should nevertheless still be considered intangible income of the testator and subject

to the tax, notwithstanding the amounts had been paid to him by Mrs. Bunting instead of directly to him by the corporation.

However such is not the case before us.

The issue here is whether the testator gave the stock to Mrs. Bunting by transferring it to her on the books of the corporation and allowing her to receive the dividends direct. There was here no retention by testator of the dividends, but an outright transfer to her. The amounts derived from dividends were paid to him by *her act and not by the corporation*. In receiving them from her in that way he recognized her as owner of the stock. Had Mrs. Bunting used the amounts of these dividends for other purposes, or paid them to some other person instead of paying them to him, it is difficult to see where he would have had any remedy or right to compel her to pay them to him.

It must be remembered that we are not here concerned with enforcement of an executory contract, but with an executed transfer, an accomplished fact which both parties to the transfer by their actions have recognized and treated as effective.

The bare fact that testator failed to deliver the new certificate to Mrs. Bunting, which was but evidence of her ownership, additional to the evidence thereof on the corporate books, is not weightier than the other circumstances indicating intention and the actual transfer to her on the books; nor do we think the mere fact that the certificate was found in testator's possession created in him any rights of dominion or control over the stock. Without Mrs. Bunting's endorsement thereon he could do nothing whatever with it. If he had attempted to revoke the transfer, the corporation could not allow him to do so without her endorsement, nor could he sell or hypothecate it to any one or deal with it in any way without her indorsement thereon.

What he had in his possession was but the shadow from which the substance had already departed by his own voluntary act.

The Court should not lightly override the testator's manifest intention, nor undo upon too refined and technical grounds that which Mr. Copeland voluntarily did with the utmost deliberation in order to divest a title which he, after the transfer, had recognized to be in Mrs. Bunting by receiving the dividends from her.

. Had Mr. Copeland retained the original certificate in his own name, endorsed by him in blank, or the new certificate in Mrs. Bunting's name endorsed by her in blank, a wholly different case would be thus presented. But the mere retention of a certificate, showing upon its face the name of Mrs. Bunting as owner, and not endorsed by her, not only conferred no rights upon Mr. Copeland to deal with the stock any further but is indicative of no intention on his part either one way or the other. If Mr. Copeland had intended to keep control of the stock, he knew from the 50 shares in the name of David J. Craig, endorsed by him in blank, that an endorsement in blank by Mrs. Bunting of the stock in her name would be the appropriate method.

The second proposition advanced by appellants to the effect that Mr. Copeland did not intend to make a gift of the stock cannot be sustained for the reasons already given. We entertain no doubt as to his intention, and the only question is the somewhat technical one as to whether he defeated his own intention by failing to deliver the new certificate to Mrs. Bunting after he had caused the transfer to be made on the books of the corporation. From the authorities already cited it will be seen that the transfer is not thereby defeated.

The third proposition of appellants is that it was error to exclude from evidence the subsequent letters of the testator, Mr. Copeland, and also Mrs. Copeland's testimony of Mr. Copeland's oral statement to her. The Court below excluded the evidence under the authorities of *Bennett v. Cook, supra,* and *Ott v. Ott, supra. Sawyer v. Mabus,* 107 S. C., 369, 92 S. E., 1029, is not to the contrary, because no objection was made to the introduction

of the evidence. We concur in that ruling. When it has first been determined that there has been an executed gift or transfer, subsequent declarations of the donor are ordinarily inadmissible.

The point, however, is largely academic in the present case because the subsequent letters, if considered, would not defeat the transfer. The only portions of these letters having any bearing upon this transfer were as follows:

"October 5, 1935, 5 P. M.

Dear Catherine:

In my letter this morning I failed to tell you that the best policy was not to talk about your business affairs. The shares of stock made to you was to avoid the unfair 5% tax imposed by the S. C. Legislature. To me it is not dishonest —it is an unfair tax, and is no wrong to defeat it. I cannot become reconciled that the little I have to give to my children should be taxed, and if I can get them to do as I say—there is no reason why they should pay any tax. You should say not one word about your having the 90 shares of Statesville C. M. stock, and when I am gone continue to say nothing. Your mother was justly entitled to half of all I had, and her children are heirs to it, which was due them prior to the time of inheritance tax.   *   *   *

" *   *   *   When it is entirely convenient you may send me the amount of the first check you collected from the Statesville C. M.

Devotedly, Father."

"November 2, 1935.

Dear Catherine:

The 90 shares of Statesville Cotton Mill stock made to you—I did it to avoid the 5% state tax on the dividends. I told you this, and you approved it; at my death I mean for you to have the stock and the dividends. At present I mean to have the dividends as I need them to live on.   *   *   *

Devotedly, Father."

The motives which actuated Mr. Copeland's intention to make the gift—an act which he had the legal right to do, tax or no tax—are not material to the issue involved here as between the parties to this cause. We are not called to pass upon them, because it was not a contract to make a transfer in evasion of tax laws, but an executed transaction. If there had been a contract for Mrs. Bunting to give back the stock, we may assume, without so deciding, that the Court would not enforce it either at the suit of Mr. Copeland or of his estate after his death, nor would the Court upset the executed transfer already effected.

In like manner, if Mrs. Bunting were seeking to enforce an executory contract of Mr. Copeland's to transfer to her the stock for the purpose indicated, we may assume that the Court would not enforce it.

But regardless of motives, where there has been an executed transaction, a transfer already made, the Court leaves the title to the stock where it finds it; and as has been seen in this case, that title happens to be found in Mrs. Bunting, against whom the executors of the estate have brought this suit, among other purposes, to dislodge her title.

In so far as they bear upon Mr. Copeland's intention, the letters appear to be plain. He refers to the "shares of stock made to you," and writes her of stock which he had transferred to her and which at that time stood in her name, "you should say not one word about your having the 90 shares of Statesville C. M. stock, and when I am gone continue to say nothing." Here is an unequivocal statement of his intention that the stock was to remain hers. In negatives any intention to reserve any interest in it. Later on in the letter he asks her, when convenient, to send him what we assume was the amount of the first dividend check.

We have seen, however, from some of the authorities already cited, for instance *Grissom, Collector, v. Sternberger, supra,* and cases there cited, that, even if he had actually retained or reserved the right to dividends, which he did not do, it would not prevent an immediate gift of the stock.

That he wishes to use the dividends and expected his daughter to comply with this wish is indicated by his next letter, where he again refers to the stock as already "made to her" and that he told her and she approved it and adds "at my death I mean for you to have the stock and the dividends. At present I mean to have the dividends as I need them to live on." He took no steps to reserve or retain the dividends beyond asking his daughter to let him have them, with which request she complied. In the existing state of the title to the stock in which Mr. Copeland had himself already placed it, that could be nothing more than a request. His expressed intention is very plain that he intended for her to have the stock and the dividends, except that he wished her to pay him the dividends at present as he needed them to live on.

The testimony of Mrs. Copeland that Mr. Copeland told her "it will still be my stock," even if admissible, could not in probative value override Mr. Copeland's written statement of his intentions. It is, however, subject to the provisions of Section 692 of the Code of 1932.

It is the judgment of this Court that the decree and judgment appealed from be affirmed.

It remains now to dispose of the appeal from the order settling the Transcript of Record. The appellants have taken nine exceptions to the order of settlement. The matters covered by the first eight exceptions relate more to form and arrangement of the appeal record than to substance. No material matter not elsewhere shown in the record appears to have been excluded and nothing not properly a part of the record appears to have been included. It was not improper to include as much of the pleadings, testimony and report of the Referee as was printed. The case has thereby been presented more clearly and directly than by paraphrasing or too fragmentary a narrative or summary, especially as error in the exclusion of certain of the evidence is assigned in the exceptions on this appeal. The order appealed from was properly included.

Shortening of the record, a very desirable end, can best be attained by eliminating immaterial or relatively unimportant or cumulative matters and repetitions, leaving in the record essential and vital matters in their original form, rather than by restatement in different words.

Perhaps the exceptions to the Referee's report might possibly have been omitted, but doubtless the Circuit Judge felt that they were helpful to an understanding of the decree which sustained the report of the Referee without assigning additional or different reasons, and some latitude must be allowed the Circuit Judge in passing upon the contents of the appeal record. There was no denial of any legal right of appellants nor any prejudice shown. We see no reason to disturb the exercise by the Circuit Judge of his best judgment in the foregoing respects in this case.

As to the ninth exception, the order provided: "If any appeal is taken from this order settling the case on appeal. It is ordered that the proposed transcript, the proposed amendments and this order be printed in connection with any such appeal from the order settling the case."

On the face of it this seems to be a simple and fair provision, but the result, doubtless not anticipated or intended, has been to present to this Court an appendix including repetition of portions already printed, and in a form which is very confused, scattered and difficult to follow. The fact that this was done in compliance with the explicit requirement in the order renders it difficult for this Court to impose the costs of printing this confusing appendix upon the appellants.

Section 7 of Rule 4 of the Rules of this Court provides: "Any party aggrieved by the order of settlement may appeal therefrom and insert in an appendix to the case as settled such matters as may be necessary for the proper consideration of his appeal."

This right may not be restricted or enlarged by the Circuit Judge. The purpose of the rule is to provide a method of review in case prejudicial error

should be committed in the order settling the Transcript of Record. Either party, if aggrieved, is given the right to appeal· to this Court from such order, and to print, in an appendix such matters as are necessary to enable this Court to give proper consideration to such appeal.

The practice contemplated is for this Court, rather than the Circuit Judge, to pass final judgment upon the contents of the appendix. When the Circuit Judge has issued his order settling the contents of the transcript proper, his order settles the contents of that record, but he has not been given power by the rule to direct or control the contents of the appendix.

If a Circuit Judge had the power to require matter to be included or excluded in the appendix, it might, though it does not do so in this case, either hamper or in some situations entirely defeat an effective appeal from the order of settlement.

The party appealing from the order of settlement has the right to print, at his own expense in the first instance, and subject to the final determination of this Court in regard thereto, such matters as are necessary for the proper consideration of his appeal. Should an appellant abuse the privilege or print matters in the appendix that are not necessary or proper, this Court has ample power by taxation of costs against him, or other appropriate action, to effectually discourage a repetition of the offense.

We are satisfied, in the present case, that the able and learned Circuit Judge did not intend or foresee the confusing effect of this requirement in his order, as it is not apparent until the Transcript of Record had been set up in print. But, in view of the provisions of the rule, the ninth exception to the order of settlement must be sustained. And the costs, therefore, of printing the appendix shall not be borne by appellants except so much thereof as touches upon a proposed hearing before Judge Featherstone, who disqualified himself, which has no pos-

sible bearing upon any issue involved in the appeal from the order of Judge Greene.

MR. CHIEF JUSTICE BONHAM and MESSRS. JUSTICES BAKER, FISHBURNE and STUKES concur.